**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

KIMBERLY LAMARCA,

      Plaintiff,

vs.                                                                                    Civ. No. 05-702 JP/WDS

CITY OF ALBUQUERQUE and BERNALILLO COUNTY
METROPOLITAN DETENTION CENTER,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

On March 23, 2007, Defendants filed a Motion for Summary Judgment Requesting

Dismissal of Plaintiff's Complaint (Doc. No. 38). On April 10, Plaintiff filed her Response to

Defendants' Motion for Summary Judgment (Doc. No. 42). On April 18, Defendants filed their

Reply in Support of Its Motion for Summary Judgment (Doc. No. 43). Because of deficiencies in

Plaintiff's response to Defendants' motion, the Court ordered Plaintiff to file a supplemental

response (Doc. No. 48). On May 15, Plaintiff filed Plaintiff's Supplemental Response to

Defendant's Motion for Summary Judgment and a Notice of Additional Exhibit to Plaintiff's

Supplemental Response to Defendant's Motion for Summary Judgment (Doc. Nos. 49 & 50).

The Court held a pretrial conference and motion hearing on July 6, 2007. Phillip Martinez

represented the Plaintiff and Beatrice J. Brickhouse represented the Defendants. Several months

after the pretrial conference, on October 10, Defendants filed a Supplemental Motion for

Summary Judgment (Doc. No. 64), arguing that Plaintiff had failed to comply with the Court's

Order (Doc. No. 59) that was entered July 16 following the pretrial conference. Plaintiff filed a

Response to Supplemental Motion for Summary Judgment (Doc. No. 65) on October 15, refuting

1

Defendants' claim that the Court's July 16th order required Plaintiff to make additional filings.

Having considered the parties' arguments at the pretrial conference, the briefs, and admissible evidence in the record, the Court concludes that Defendants' original motion for summary judgment should be granted, but Defendants' supplemental motion for summary judgment should be denied on the ground it is moot.

## I.        INTRODUCTION

This case arises from Plaintiff Kimberly LaMarca's employment at the Bernalillo County Metropolitan Detention Center ("BCMDC") by the City of Albuquerque. The Plaintiff asserts three claims against Defendants under Title VII of the Civil Rights Act of 1964. First, she alleges a hostile work environment based on sexual harassment. Second, she contends that she was constructively discharged from her position at BCMDC because of this harassment, and from her subsequent position at the Solid Waste Management Department because she was assigned to an unacceptable shift. Finally, she claims that BCMDC and the City retaliated against her for engaging in Title VII–protected activity. Plaintiff requests an unspecified amount of compensatory damages.

Defendants seek summary judgment on all of Plaintiff's claims.

## II.       BACKGROUND

Plaintiff Kimberly LaMarca worked as a corrections officer for the City of Albuquerque from 1997 to 2003. (MSJ at 1.) In 2000, the City employed Plaintiff as a tracker—a corrections officer who supervises and manages individuals under house arrest. (*Id.*) In June 2000, Plaintiff filed a Department of Labor complaint against the City alleging that trackers were not being paid for their overtime hours. As a result of her complaint, she and other corrections officers received

compensation. (*Id.* at 1–2.)

Plaintiff alleges that from that point forward her supervisors engaged in retaliatory acts including: (1) sending e-mails with "misinformation about Plaintiff"; (2) soliciting inmates to submit false complaints against her or to disobey her; (3) locking cell doors so that she "could not get out"; (4) placing her in dangerous areas of the facility in violation of BCMDC policies; (5) encouraging inmates to sexually harass and make lewd remarks directed at her; and (6) locking a master control corridor and thereby preventing her from using a restroom for several hours. (Compl. ¶¶ 17–24.)

In 2001 Plaintiff helped another female corrections officer file an Equal Employment Opportunity Commission ("EEOC") complaint of sexual harassment claim against a supervisor. Plaintiff felt that her relationship with that supervisor became tense afterwards. (LaMarca Dep., MSJ Ex. A, at 144:1–8, 11, 18–25, 145:10–11.) Plaintiff was injured on the job on two occasions in 2002 and 2003, resulting in her reassignment to light-duty activities. (MSJ at 2.) In September 2003, the City conducted a fitness-for-duty evaluation and placed limits on Plaintiff's physical job duties, in effect mandating that Plaintiff have no contact with inmates. (*Id.*) The City's human resources department worked with Plaintiff to find her a position outside BCMDC, and Plaintiff was ultimately transferred to a security officer position at the City's Solid Waste Management Department on November 25, 2003. (*Id.* ¶¶ 36–39.)

The new position required her to work the evening shift, though Plaintiff repeatedly requested to be assigned to the day shift and to have her weekends free so that she could care for her disabled son. (*Id.* ¶¶ 38, 41.) The City accommodated this request for several weeks but eventually reassigned her to the evening shift. (*Id.* ¶¶ 42, 45.) Plaintiff ceased showing up for

work in late December 2003 and on January 16, the City notified her that in doing so, she had

violated City policies. (*Id.* ¶¶ 46–48.) On January 22, 2004, Plaintiff failed to appear at a hearing

on these violations, and the City terminated her employment after concluding that Plaintiff had

abandoned her job. (*Id.* ¶ 49.)

On January 7, 2004—after Plaintiff stopped reporting to work but before her employment

was officially terminated—Plaintiff filed an EEOC Charge of Discrimination alleging sex

discrimination and retaliation related to her employment with the City. (MSJ at 2.) In March

2005, Plaintiff received a Notice of Right to Sue for those claims. In June 2005, Plaintiff filed

this lawsuit alleging race and gender discrimination, sexual harassment, Title VII retaliation, and

intentional infliction of emotional distress.[1] (*Id.*)

## III.    STANDARD: Motions for Summary Judgment and Applicable Law

Summary judgment is appropriate only if there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law. *Santana v. City & County of

Denver*, 488 F.3d 860, 864 (10th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). The court must

examine the record and draw reasonable inferences therefrom in the light most favorable to the

nonmoving party. *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

Summary judgment is proper where the record, taken as a whole, could not lead a rational trier

---

[1]During the pretrial conference, Plaintiff's counsel withdrew her claims of race and
gender discrimination, and intentional infliction of emotional distress. The Court dismissed these
claims on July 16, 2007. (Doc. No. 59.) Plaintiff's original complaint included claims against
five City of Albuquerque employees. On August 30, 2006 the Court dismissed these claims
because Plaintiff failed to serve process on them. (Doc. No. 25.) Therefore, the only remaining
Defendants are the City of Albuquerque and the Bernalillo County Metropolitan Detention
Center.

of fact to find for the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.")

## IV.    DISCUSSION

### 1. Hostile Work Environment Based on Sexual Harassment

Plaintiff alleges the creation of a hostile work environment based on sexual harassment. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1) (2006). Prohibited discrimination includes subjecting an employee to a hostile work environment.[2] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1262 (10th Cir. 2005). To establish a prima facie case of hostile work environment the plaintiff must demonstrate the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) the "harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *See Dick*, 397 F.3d at 1262–63 (internal quotations omitted).

---

[2]In general, there are two types of sexual harassment claims. The first is often referred to as a "quid pro quo" claim in which employment advantages are offered for sexual favors, or penalties threatened for denying such favors. The second, the general hostile work environment claim, concerns unfulfilled threats of a sexual nature. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

Plaintiff is female—a group protected under Title VII. She alleges that she was subjected to unwelcome harassment. (Compl. ¶ 33.) First, she alleges that twice in August 2003, her supervisors locked her in areas of the BCMDC facility where inmates subjected her to "sexual harassment and lewd sexual remarks." (*Id.* ¶¶ 22–23.) Plaintiff also alleges that her male supervisors "harassed, intimidated, and threatened her continually." (*Id.* ¶ 27.) For example, she alleges that her supervisor(s) denied her restroom privileges (*id.* ¶¶ 24–25), "instructed and encouraged the inmates to disobey her" (*id.* ¶ 26), and "fraudulently solicited about 4 inmates to present complaints against [her]." (*id.* ¶ 19.)

As the third element of the prima facie case, Plaintiff must demonstrate that these alleged incidents of harassment were based on her sex. Plaintiff can take one of three evidentiary routes to show that the harassment was based on sex. *Dick*, 397 F.3d at 1263 (*citing Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998)). The first is to show that a harasser of opposite sex has made "explicit or implicit proposals of sexual activity." *Id.* (*quoting Oncale*, 523 U.S. at 80). Second, a coworker of the same sex who harasses the plaintiff "in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of [persons of that gender] the workplace." *Id.* Third, and most relevant to Plaintiff's case, discrimination based on sex may be inferred when the harasser treats men and women differently in the workplace. Plaintiff alleges that "[e]mployees of the opposite sex were not subjected to the harassment described hereinabove, and Plaintiff was subjected to such harassment substantially on the basis of her sex." (Compl. ¶ 32.) Defendants argue that Plaintiff cannot show that the alleged harassment was due to her gender, and that her deposition testimony undermines her case by asserting that the harassment was in retaliation for her

6

reporting to the Department of Labor. (MSJ at 3.)

Finally, Plaintiff must demonstrate that the conduct is "so severe or pervasive as to alter the conditions of [her] employment and create an abusive working environment." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (quotations marks omitted); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) (same). Severity of the harassment is objective—it is to be considered from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. *Oncale*, 523 U.S. at 81. The nature of the workplace and plaintiff's relation to the harasser(s) is essential to this assessment—the court must "careful[ly] consider[] . . . the social context in which particular behavior occurs and is experienced by its target." *Id.* The court must also consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Breeden*, 532 U.S. at 270–71 (internal quotation marks and citation omitted).

To determine whether the harassment altered the conditions of Plaintiff's employment, the Court can only consider Plaintiff's allegations that are supported by admissible evidence and that are otherwise pertinent to a Title VII claim—that is, actions motivated by her sex. In addition, the Court may not consider incidents that occurred more than 300 days before Plaintiff filed her EEOC Charge of Discrimination on January 7, 2004. *See* 42 U.S.C. § 2000e-5(e)(1). This bars the Court from considering incidents that occurred before March 13, 2003, including Plaintiff's allegations that her supervisor(s): (1) sent an e-mail with misinformation about her (Compl. ¶ 18), (2) solicited inmates to submit false complaints against her (*id.* ¶ 19), (3) ordered cell doors blocked to trap her (*id.* ¶ 20); and (4) "instigated the issuance of scores of letters of

7

investigation" directed against her (*id.* ¶ 21).[3] The continuing violation doctrine allows Plaintiff to include incidents that occurred outside the statutory time period if there is "at least one instance of the discriminatory practice within the filing period . . . , and the earlier acts [are] part of a continuing policy or practice that includes the act or acts within the statutory period." *Martin v. Nannie & the Newborns*, 3 F.3d 1410, 1415 (10th Cir. 1993).[4]

However, the Court does not need to determine whether these potentially time-barred allegations can be considered under the continuing violation doctrine because all four must be excluded from Plaintiff's evidentiary basis for other reasons. Regarding the allegation that her supervisor Torres sent an e-mail containing misinformation about her, Plaintiff admits that Torres sent this e-mail in retaliation for her whistle-blowing activity to the Department of Labor. (LaMarca Dep. at 72:3–8, 88:13–22 ("It was a threat to discontinue what I was doing . . . [f]iling with the Department of Labor.")). To serve as evidence supporting a hostile work environment claim, Plaintiff must show that the harassment was "based on sex." Because Plaintiff provides a single and different motivation for Torres's harassment, Torres's conduct was manifestly not motivated by Plaintiff's sex and cannot help to establish her Title VII claim. Plaintiff's allegation that her supervisors instigated letters of complaint against her (Compl. ¶ 21) is

_____

[3]Plaintiff's complaint does not specify when the alleged misconduct in paragraph 21 occurred. However, Plaintiff's deposition indicates that it occurred around September 2002. (LaMarca Dep. at 109:11–14).

[4]To determine whether multiple acts of discrimination constitute a continuing pattern of discrimination, the Court must consider: "(i) subject matter—whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence—whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Martin*, 3 F.3d at 1415.

likewise unaccompanied by any evidence that this alleged instigation was motivated by her sex. Plaintiff also fails to submit any evidence that her supervisors instigated these letters. The third allegation, that her supervisors solicited false complaints from inmates (*id.* ¶ 19), is supported only by Plaintiff's statements that the inmates told her they had been asked by her supervisors to file the complaints. (LaMarca Dep. at 92.) The inmates' statements, as related by Plaintiff, are inadmissible hearsay.[5] Finally, Plaintiff made statements in her deposition withdrawing the allegation concerning the cell doors being blocked. (LaMarca Dep. at 105:7–11.)

In addition, Plaintiff alleges approximately seven incidents occurring since March 14, 2003. (Compl. ¶¶ 21–26, 30.) The Court addresses each of these in the order that Plaintiff presents them.

First, Plaintiff alleges that on August 17, 2003, her supervisors placed her in a section of the facility with inmates who made lewd and sexual remarks. (Compl. ¶ 22; Response at 4.) Plaintiff asserts that in a second incident on August 25 she was "locked in with 76 maximum security inmates . . . in violation of MDC policies and procedures." (Compl. ¶ 23.) According to Plaintiff, BCMDC requires the presence of at least two officers whenever more than sixty-four maximum security inmates are present. (LaMarca Dep. at 117:20–25; 118:1–5.) Henry Perea, the Deputy Chief at BCMDC, explains that both male and female officers were assigned to the maximum security unit, and that "there were occasions when the new detention center opened

_____

[5]At the pretrial conference on July 6, 2007, Plaintiff's counsel indicated that he had located a former BCMDC inmate and would obtain an affidavit regarding this incident. The Court allowed Plaintiff two months to submit an affidavit that would not be hearsay and would constitute admissible evidence. Plaintiff failed to submit any affidavits by the September 10, 2007 deadline. (Doc. No. 59 at 2).

that only one corrections officer was assigned to the unit." (Perea Aff., MSJ Ex. F, ¶ 5.) Defendants' uncontroverted evidence is that Plaintiff's supervisors did violate policy by placing her in this situation, but that this violation resulted from the difficulties of operating a new facility, not because of Plaintiff's gender. Plaintiff presents no evidence that her supervisors placed her in either of these two situations because of her gender. In addition, though the remarks inmates made to her in the August 17th incident were clearly based on her sex, Plaintiff has submitted no evidence that they can be attributed to BCMDC.[6]

Plaintiff next alleges that in November 2003 she was locked in the master control corridor and not allowed to use the restroom for six hours. (Compl. ¶ 24.) Plaintiff described the assignment in the master control corridor as a "Kimberly LaMarca assignment"—created to accommodate her work-related injury, because "they had to put [her] somewhere." (LaMarca Dep. at 119:2–120:4.) Plaintiff testified that because the assignment was created just for her, there was "no policy on who relieved [her]." (*Id.* at 120:6–8.) Deputy Chief Perea explained that Plaintiff was in the corridor for six hours because the doors malfunctioned, a common problem at the new detention center that affected both male and female corrections officers who were assigned there. (Perea Aff. ¶ 6.) Plaintiff disputes that the incident had anything to do with malfunctioning doors and claims that Major Cook, her supervisor, ordered the doors secured behind her. (Response at 4.) However, Plaintiff's deposition testimony reveals that she heard this from another officer, Lt. Gail Roque, and that Plaintiff has no personal knowledge of it.

---

[6]Plaintiff does not cite any authority supporting the theory that inmate conduct encouraged by a corrections officer can be attributed to the employer, despite the Court's suggestion during the pretrial conference that Plaintiff provide legal support for this theory.

(LaMarca Dep. at 122:16–21, 123:9–10.) Because this is hearsay, it is not evidence supporting Plaintiff's contention. Plaintiff has no admissible evidence that Major Cook intentionally ordered the doors secured behind her, or that he did so because of her gender. Plaintiff also states that the officer working in Master Control, who could have opened the doors, was asleep. (LaMarca Dep. at 123:9–25.) Even if this is true, it does not support a gender discrimination claim.

Plaintiff alleges two incidents that occurred during June 2003—that she was not allowed to respond to an assistance call from another corrections officer and that she was locked in the "Sally Port" and not allowed to go to the restroom. (Compl. ¶ 25.) Neither Defendants' nor Plaintiff's briefs elaborate on these allegations. To demonstrate that these incidents are part of a pattern of "severe and pervasive" harassment, Plaintiff must submit some evidence that these incidents violated BCMDC policies or practices, or that her supervisors engaged in these activities in order to create a hostile workplace based on gender. It would seem to be a standard condition of employment in a detention center that corrections officers would be stationed in secured (i.e., locked) areas of the detention center, and that their freedom to assist other officers or use the restroom would be restricted at times in order to ensure constant supervision of the inmates. Plaintiff does not provide any evidence that her supervisor's action in each incident was motivated by her sex. The Court will make all reasonable inferences in Plaintiff's favor in deciding Defendants' motion for summary judgment, but Plaintiff must place in the record sufficient evidence to enable a reasonable trier of fact to find in her favor. Plaintiff has failed to do so regarding the June 2003 incidents.

Next, Plaintiff states that Lt. Bell, her supervisor, instructed inmates to disobey her. (Compl. ¶ 26.) Plaintiff does not clarify the basis of her knowledge about this; she merely

11

indicates that Lt. Bell made the statements while she was on break. (LaMarca Dep. at 136:4–17.) Plaintiff does not have direct knowledge that Lt. Bell instructed the inmates to disobey her and has introduced no admissible evidence of this. Therefore, the Court must disregard this allegation in determining whether Plaintiff has made out a prima facie case of hostile work environment.

Finally, Plaintiff makes the general allegation that she was "continually subjected to sexually suggestive and derogatory comments and improper physical contacts by inmates encouraged by Defendant Supervisors and other co-workers."[7] (Compl. ¶ 30.) Plaintiff does not proffer any evidence that her supervisors actively encouraged inmates to make lewd comments or physical contact. Because she would have the burden of proof regarding her supervisors' role in this harassment at trial, she must present supporting evidence in order to defeat summary judgment. The inmates' conduct, though undoubtedly harassing, is of no legal significance absent involvement by Plaintiff's supervisors or employer. Plaintiff states that Defendants had constructive and actual notice of the inmates' harassment and "failed to investigate and take remedied [sic] action in response." (Compl. ¶¶ 34–36.) However, Plaintiff cites to no authority that Defendants can be vicariously liable for the acts of third parties not in Defendants' employ.[8]

---

[7]This allegation is contained in the Racial and Gender Discrimination section of Plaintiff's complaint. The Court has dismissed these claims, *see supra* note 1, but liberally reads Plaintiff's complaint to include this allegation as part of her sexual harassment/hostile work environment claim.

[8]Employers may be vicariously liable or directly liable based on negligence for the acts of supervisors, *see Ellerth*, 524 U.S. at 765, and coworkers, *see Hirschfeld v. N.M. Corrections Dep't*, 916 F.2d 572, 577 (10th Cir. 1990). Plaintiff's burden in holding employers liable in these cases is demanding, and the standards for vicariously liability for the actions of nonemployees could only be higher.

Unless Plaintiff has evidence that her supervisors were in some way responsible for the inmates' behavior or unreasonably failed to protect her from it, Plaintiff cannot assert a Title VII claim against her employer based on the inmates' behavior.

In summary, most of Plaintiff's allegations are unsupported by admissible evidence. Some of the allegations involve incidents that are not a matter of Plaintiff's personal knowledge, such as whether her supervisors encouraged inmates to disobey or file false complaints against her. For these, Plaintiff fails to present competent evidence that such encouragement actually occurred. In regard to incidents that allegedly occurred in Plaintiff's presence, such as her being locked in various areas of the facility, Plaintiff has no evidence that her supervisors mistreated her because of her sex. That the harassment was motivated by her sex is an element of Plaintiff's prima facie case—she bears the burden of supporting her allegations with some evidence that would allow a trier of fact to find in her favor.

Even assuming that Plaintiff's sex motivated her supervisors' proclivity for locking her into various areas of the BCMDC facility and denying her restroom privileges, the Court cannot conclude that Plaintiff has demonstrated that she experienced sexual harassment so severe and pervasive that it "alter[ed] the conditions of [her] employment." Plaintiff's job description specifically notes that corrections officers may be exposed to "potentially hostile environments" due to the nature of the position, and that essential functions of the job includes "patrol[ling] designated areas," "control[ling] traffic to and from assigned areas," and generally maintaining order and control. (MSJ Ex. B.) The incidents of which Plaintiff complains do not seem to alter the conditions of her employment so much as they seem typical of a corrections officer's workplace. Considering the totality of the circumstances, the Court concludes that no reasonable

person could determine that the incidents Plaintiff describes violated Title VII. Because Plaintiff

has failed to demonstrate that she was subject to severe and pervasive sex-based discrimination,

she has not established a prima facie case of hostile work environment, and Defendants are

entitled to summary judgment on this claim.

### 2. Constructive Discharge

Plaintiff also asserts a constructive discharge claim, though it is unclear whether Plaintiff

alleges that she was constructively discharged from her position at BCMDC or from the Solid

Waste Management Department. Plaintiff argues that the harassment and hostile work

environment at BCMDC forced her to quit working there, and that she was "constructively

fired." (Compl. ¶¶ 28, 45.) Plaintiff also argues that she was constructively discharged by her

reassignment to the night shift at the Solid Waste Management Department, a shift that was

unacceptable to her because of her need to care for her son in the evenings. (Pl.'s Supp.

Response at 4.) Defendants address only Plaintiff's claim regarding the Solid Waste

Management Department. (MSJ at 20.) Reading the complaint liberally, the Court will analyze

whether Plaintiff has a valid constructive discharge claim in either circumstance.

Constructive discharge allows an employee to pursue remedies that would be available

for a formal discharge if that employee voluntarily resigns because of "unendurable working

conditions." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) (internal quotations omitted).

To establish a constructive discharge claim based on harassment under Title VII, the plaintiff

"must show that the abusive working environment became so intolerable that her resignation

qualified as a fitting response." *Id.* at 133. To determine whether working conditions are

intolerable, the Tenth Circuit applies "an objective test under which neither the employee's

14

subjective views of the situation, nor her employer's subjective intent . . . are relevant." *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004). In addition, the court must assess "not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Id.*

Constructive discharge can be thought of as an "aggravated case of . . . hostile work environment." *Suders*, 542 U.S. at 146. For the plaintiff to obtain relief on a constructive discharge theory, she must show "something more" than the degree of workplace harassment necessary to make out a hostile work environment claim. *Id.* at 147. Because the Court has concluded that the alleged incidents of harassment at the BCMDC did not amount to an actionable hostile work environment claim, Plaintiff *a fortiori* cannot demonstrate the level of "intolerable" harassment necessary to claim that she was constructively discharged from her position at BCMDC. Moreover, since Plaintiff did not resign from that position, but instead was involuntarily transferred to employment at the Solid Waste Management Department, the constructive discharge doctrine is inapplicable.

Plaintiff also argues that she was constructively discharged by her reassignment to the night shift at the Solid Waste Management Department. She argues that nighttime duty was intolerable because she needed to care for her son in the evenings and because the reassignment allegedly would result in long-term loss of salary and benefits. (Pl.'s Supp. Response at 4.) The Court will assume that Plaintiff did effectively resign from this position by her December 24, 2003 letter to the City human resources department, in which she declined to accept the position in the Solid Waste Management Department after it became clear that she would be required to work the night shift. (*Id.* at Intro. ¶ 6.) However, a claim for constructive discharge arises when

15

working conditions are made intolerable by *illegal discriminatory* acts by the employer. *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004). Here, the act of reassigning Plaintiff to a shift unacceptable to her was not discriminatory. Instead, Plaintiff was assigned to that shift because of the City's budgetary constraints and need to comply with a collective bargaining agreement. (Aff. of Michael Archuleta, MSJ Ex. J, ¶ 5.)

Thus, Plaintiff has not demonstrated that she was constructively discharged from either BCMDC or the Solid Waste Management Department, and summary judgment will be entered in favor of Defendants on Plaintiff's claims of constructive discharge.

**3. Title VII Retaliation**

Title VII prohibits employers from retaliating against an employee who opposes practices made unlawful by the statute. 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation requires a plaintiff to demonstrate (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection exists between the protected activity and the materially adverse action. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). The *McDonnell Douglas* burden-shifting framework applies to Title VII retaliation claims that rely on circumstantial evidence. *See Proctor v. UPS*, No. 06-3115, 2007 U.S. App. LEXIS 22306, at *16 (10th Cir. Sept. 18, 2007); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Under that framework, the burden is initially on the plaintiff to establish a prima facie case. If the plaintiff can do so, then the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the materially adverse action. The plaintiff can then defeat summary judgment only if

16

she can show that her employer's reasons are pretextual.

Here, Defendants claim that Plaintiff has failed to carry her burden on all three elements of the prima facie test. Defendants first contend that Plaintiff did not engage in protected opposition to discrimination. Plaintiff argues that she engaged in protected opposition on two separate occasions. (*See* Compl. ¶ 44.) The first was when she filed a complaint with the Department of Labor in June 2000 regarding BCMDC's failure to pay overtime wages to some of its employees. (*Id.* ¶¶ 14–15.) Thereafter, Plaintiff continued to report on her supervisors' payroll infractions and violations of the Family and Medical Leave Act ("FMLA"). (*Id.* ¶ 16.) Second, Plaintiff assisted another female corrections officer in 2001 with a sexual harassment claim against her supervisor.[9] (Response at 11; LaMarca Dep. at 222:3–225:10.) While BCMDC's overtime, payroll, and FMLA violations are objectionable, they do not implicate any of Title VII's concerns, namely discrimination on the basis of race, color, religion, sex, or national origin. Thus, Plaintiff's reporting to the Department of Labor on these issues does not constitute protected opposition for the purposes of a Title VII retaliation claim. On the other hand, Plaintiff's aiding of her colleague with a sexual harassment claim *is* the type of protected opposition contemplated by Title VII.

Second, Defendants contend that Plaintiff was not subjected to any adverse employment action. (MSJ at 18–19.) However, Plaintiff is not required to show an adverse employment

---

[9]Plaintiff did not discuss her involvement in her coworker's sexual harassment claim in her complaint; she first mentioned it in her response to Defendants' motion for summary judgment. The Court will construe this as an amendment of Plaintiff's complaint because Defendants had an opportunity to address this argument in their Reply in support of their motion for summary judgment. In addition, because it does not add a new claim, but merely explains one originally asserted, Defendants are not unfairly prejudiced.

action, only a "materially adverse" action. In *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court held that an employer's liability under Title VII's anti-retaliation provision is "not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 2412–13, but instead includes any actions that a reasonable employee would find materially adverse, such as those that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2415 (*quoting Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Plaintiff alleges two retaliatory actions. First, that she was assigned to less favorable posts and subjected to a hostile work environment beginning in July 2001. (Compl. ¶¶ 17, 44.) Second, that the City "constructively terminated [her] employment with the MDC" in November 2003. (Compl. ¶ 45.) The Court must assess whether either of these alleged retaliatory acts "might have dissuaded" Plaintiff from supporting her coworker in filing her sexual harassment complaint. In addition, Plaintiff must demonstrate that her protected activity motivated her employer's adverse actions.

### A. Unfavorable Assignments and Hostile Work Environment

Plaintiff's complaint is not specific about what kind of unfavorable reassignments she experienced and when these occurred. However, in her response to Defendants' motion for summary judgment, Plaintiff states that she was assigned "to areas of the detention center that where [sic] unnecessarily dangerous and subjected her to abusive situations and sexual harassment from inmates." (Response at 12.) Plaintiff does not cite to her deposition testimony or to any other form of evidence supporting this statement. To survive a motion for summary judgment, Plaintiff must do more than allege that she was subjected to an "unnecessarily

18

dangerous" situation. She must provide the Court with sufficient evidence from which a reasonable finder of fact could conclude that the situation was unnecessarily dangerous, in light of the fact that Plaintiff was employed as a corrections officer in a detention center, a job that necessarily involves risk of physical and verbal harassment. (*See* MSJ Ex. B.) Because Plaintiff has not described the reassignments with specificity, or provided evidence supporting her characterization of them, she has not created a genuine issue of fact about whether they were "materially adverse." Plaintiff's lack of specificity also makes it difficult for the Court to assess whether she has satisfied the third element of the prima facie case of retaliation—causation. Plaintiff asserts that she was reassigned to these areas "immediately after she engaged in protected activity." (Response at 12.) Plaintiff does not provide any dates about when she was reassigned or which incidents of protected activity she is referring to. The inference of causation to be drawn from temporal proximity is highly sensitive to the length of intervening time. The Tenth Circuit has repeatedly held that time lags of as little as three months do not support an inference of causation and must be bolstered by circumstantial evidence of retaliatory motive. *See Proctor*, 2007 U.S. App. LEXIS 22306, at *18–20. No reasonable finder of fact could conclude, based on the facts submitted by Plaintiff, that her protected activity motivated her reassignments. Furthermore, Plaintiff's general reference to her "protected activity" does not indicate whether Plaintiff is referring to her Title VII–protected activity, or to her reporting to the Department of Labor, the protected activity that features most prominently in her complaint.

As support for Plaintiff's allegation that she was broadly retaliated against by the creation of a hostile work environment, the Court may consider only those incidents that Plaintiff backs with competent evidence and that are not time-barred. *Proctor*, 2007 U.S. App. LEXIS 22306, at

*23. In addition, if Plaintiff has identified an alternative motive for a particular incident of harassment or hostility, the Court will not include that incident as part of Plaintiff's evidence that Defendants retaliated against her based on her Title VII–protected activity. For example, Plaintiff's complaint specifically attributes her BCMDC supervisors' hostile and harassing actions to her whistle-blowing activity on payroll, overtime, and FMLA violations—not to her assistance with her colleague's sexual harassment complaint. (*See* Compl. ¶¶ 14–17.) Plaintiff's allegations that her supervisors fraudulently solicited inmates to present complaints (*id.* ¶ 19) and instructed inmates to disobey her (*id.* ¶ 26) must be excluded because Plaintiff has proffered no competent evidence to support them. This leaves the two August 2003 incidents in regard to which Plaintiff alleges she was confined with a high number of maximum security inmates by herself, in violation of BCMDC policy. Defendants present evidence that this policy violation was common during the transition period at the new detention center (Perea Aff. ¶ 5) and Plaintiff does not dispute that other corrections officers were placed in the same situation. If Plaintiff was not singled out, this action is unlikely to have been retaliatory. In addition, if this assignment was common, as the uncontroverted evidence shows, then the possibility of being placed there would not have deterred Plaintiff from engaging in Title VII–protected activity.

Finally, there are Plaintiff's allegations that she was locked in the "Sally Port" and in the master control corridor and not allowed to go to the restroom. Plaintiff does not cite to any evidence that being locked in the "Sally Port" was contrary to policy, or that being denied restroom privileges was a deliberate hostile action. As with Plaintiff's hostile work environment claim, a standard or typical workplace condition cannot constitute a materially adverse action by the employer. Plaintiff's allegation that she was locked into the master control corridor does not

20

constitute a materially adverse action because Plaintiff does not contradict Defendants' evidence that the confinement was unintentional and resulted from a door malfunction. In addition, Plaintiff's own testimony is that there was no established procedure for relieving her because the position was created especially for her due to her physical limitations. (LaMarca Dep. at 119:2–120:4.)

Even if any of these incidents amounted to materially adverse action, Plaintiff must also show a causal link between her protected activity and the adverse action. Plaintiff can do so by presenting "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1228 (10th Cir. 2006) (quotations omitted). Temporal proximity alone may suffice to show causation; otherwise "plaintiff must offer additional evidence to establish causation." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001). The Tenth Circuit recently dismissed a retaliation claim in which four months had lapsed between the protected activity and the materially adverse action. *Proctor*, 2007 U.S. App. LEXIS 22306, at *18–20 (citing Tenth Circuit precedents rejecting claims involving three-month gaps). In *Proctor*, the court held that the four-month lapse itself did not support an inference of causation, and looked at the plaintiff's circumstantial evidence that the employer's decision was pretextual to support such an inference. *Id.* at *20–21.

Here, no inference of causation can be drawn based on temporal proximity, because more than a year intervened between Plaintiff's assistance of her coworker and the various incidents of retaliation that she alleges. Plaintiff provides no other evidence that these incidents were in retaliation for her Title VII–protected activity. To the contrary, Plaintiff's complaint attributes

21

these incidents to a different cause, namely her Department of Labor whistle-blowing. (Compl. ¶ 17.) Therefore, Plaintiff has failed to make out a prima facie case that her allegedly hostile and harassing work environment was in retaliation for assisting in her coworker's EEOC complaint.

### B. Transfer from BCMDC

Plaintiff alleges that the City "constructively terminated [her] employment with the MDC" (Compl. ¶ 45) and her briefs indicate that she believes this happened when she was "transferred to a position with a schedule that would not accommodate her childcare needs." (Response at 12.) Plaintiff's reassignment to the night shift at the Solid Waste Management Department may constitute a materially adverse action. Plaintiff argues that the reassignment to the Solid Waste Management Department was unacceptable because it required her to work the night shift, which would prevent her from caring for her disabled son in the evenings. In the recent *Burlington Northern* decision setting out the "materially adverse" standard, the Supreme Court provided an example similar to Plaintiff's situation: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Burlington Northern*, 126 S. Ct. at 2415. Plaintiff has a specific objection to the shift change that rises above a "mere inconvenience." *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998); *see also McGowan*, 472 F.3d at 743 (holding that a plaintiff's "undefined subjective" shift preference was not actionable under the *Burlington Northern* "materially adverse action" standard where the new shift provided the same pay and benefits and was no more arduous). Plaintiff also argues that while her pay level in the Solid Waste Management Department was equal to what she had received at BCMDC, it was "red-circled," meaning that it would increase more slowly. (Response ¶ 3.) These changes in her

employment conditions are arguably "materially adverse."

However, Plaintiff fails to show a causal connection between her protected activity and the reassignment to the Solid Waste Management Department. Plaintiff's protected activity occurred at some time in 2001 and the City transferred her to the Solid Waste Management Department in November 2003—approximately two years later. Given the lack of temporal proximity, Plaintiff must submit other evidence of retaliation based on her Title VII–protected activity. *See Proctor*, 2007 U.S. App. LEXIS 22306, at *18–20; *O'Neal*, 237 F.3d at 1253. Plaintiff points to no evidence that the City human resources department officials who transferred her did so because she had helped a coworker file an EEOC complaint against her supervisor, or that they were even aware that she had done so. To the contrary, Plaintiff's complaint repeatedly suggests that she was mistreated because of her complaint to the Department of Labor regarding BCMDC's failure to pay overtime wages. In her deposition, Plaintiff testified that she believed she was transferred away from BDMDC and ultimately terminated because she was a "whistleblower" and a "problem child" who reported incidents of inmate abuse, poor conditions at BCMDC, and other problems with management of the facility.[10] (LaMarca Dep. at 167:2–7, 168:17–25, 170:6–25, 171:1–25.) This suggests that even if her transfer to the Solid Waste Management Department was an act of retaliation, it was retaliation for her whistle-blowing conduct, and not for Title VII–protected activity. Therefore, the Court

---

[10]Interspersed with Plaintiff's statements that she was fired because of her whistle-blowing activities, she states that the City human resources department wanted to transfer her from BCMDC because her supervisors were harassing her, and that they were concerned she would sue the City. (LaMarca Dep. at 169:4–8.) However, Plaintiff never directly alleges, in her complaint, briefs, or deposition, that her transfer resulted from her assistance with her coworker's sexual harassment complaint.

concludes that Plaintiff has not made out a prima facie case of Title VII retaliation.

Even if Plaintiff could establish a prima facie case of Title VII retaliation, Defendants have identified a legitimate, nondiscriminatory reason for transferring Plaintiff to the Solid Waste Management Department. The City's human resources director noted in her affidavit that Plaintiff was transferred "because of her physical limitations and the requirement that she have no inmate contact at the detention center." (Miller Aff. ¶ 10, MSJ, Ex. H; *see also id.* ¶ 37.)

Neither Plaintiff's complaint or briefs argue that this proffered reason is pretextual and that Defendants' true motive was retaliation for her Title VII–protected activity. Plaintiff's deposition reveals that Plaintiff believes she was transferred because she was a whistleblower and a "problem child" based on her reporting to the Department of Labor. These allegations are unsupported by any evidence—they are simply Plaintiff's personal beliefs about the City's motivation. Moreover, they certainly defeat any inference that she was transferred to the night shift because of her Title VII–protected activity.

Based on the totality of the circumstances, the Court concludes that the City transferred Plaintiff in good faith because of Plaintiff's inability to continue with the types of responsibilities she had with BCMDC prior to her final fitness-for-duty evaluation. Moreover, it appears that the City's human resources department made the decision to transfer her and that none of her former supervisors was directly involved with the decision. There is no evidence that this decision was motivated by a desire to terminate Plaintiff's employment at BCMDC based on Plaintiff assisting her colleague with a sexual harassment claim.

**IT IS THEREFORE ORDERED** that

1.  Defendants' Motion for Summary Judgment (Doc. No. 38) is **GRANTED** on all of Plaintiff's claims; and

2.  Defendants' Supplemental Motion for Summary Judgment (Doc. No. 64) is **DENIED** as moot.

_____

SENIOR UNITED STATES DISTRICT JUDGE

25